UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

                                 Case No.  15-20652
vs.                              HON.  GEORGE CARAM STEEH

D3 EUGENE FISHER,
D4 COREY BAILEY,
D6 ROBERT BROWN,
D13 ARLANDIS SHY,
D19 KEITHON PORTER,

                Defendants.

_____/

OPINION AND ORDER DENYING DEFENDANTS'
MOTIONS FOR JUDGMENT OF ACQUITTAL
[ECF NO. 1144, 1146, 1147, 1148 AND 1149)

At the close of the government's case following a six week trial, the

defendants reserved their right to file motions for judgment of acquittal

pursuant to Federal Rule of Criminal Procedure 29(a).  Motions were filed

by Robert Brown (ECF No. 1144), Arlandis Shy (ECF No. 1146), Corey

Bailey (ECF No. 1147), Keithon Porter (ECF No. 1148) and Eugene Fisher,

who concurred in the motion filed by Corey Bailey (ECF No. 1149).  The

court heard oral argument on each motion on August 20, 2018 while the

- 1 -

jury was deliberating.  For the reasons stated below, defendants' motions are DENIED.

## I. Legal Standard

"[A] defendant claiming insufficiency of the evidence bears a heavy burden." *United States v. Maliszewski,* 161 F.3d 992, 1005 (6th Cir.1998). "In reviewing a claim of insufficient evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Salgado*, 250 F.3d 4338, 446 (6th Cir. 2001) (emphasis in original) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).  The Government "must present substantial evidence as to each element of the offense."  *Brown v. Davis*, 752 F.2d 1142, 1145 (6th Cir. 1985) (internal citations omitted). "Substantial evidence is more than a scintilla.  It means such relevant evidence as a reasonable mind might accept to support a conclusion.  It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred."  *United States v. Martin*, 375 F.2d 956, 957 (6th Cir. 1967).  "The government may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt."  *Salgado*, 250 F.3d at 446 (citing

*United States v. Jackson,* 55 F.3d 1219, 1225 (6th Cir. 1995)).  "In assessing the sufficiency of the evidence, 'we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury.'"  *Id.* (citing *United States v. Wright,* 16 F.3d 1429, 1440 (6th Cir. 1994)).

## II. Discussion

## A. RICO Conspiracy

### 1. Racketeering Enterprise

The existence of the racketeering enterprise is a required element of the RICO conspiracy offense charged in Count One.  18 USC §1962 sets forth the following relevant prohibited conduct:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

An association-in-fact racketeering enterprise, as alleged in the present indictment, must be "a continuing unit that functions with a common purpose. *United States v. Turkette*, 452 U.S. 576 (1981).  It must have at least three structural features: "a purpose, relationships among those

associated with the racketeering enterprise, and longevity sufficient to permit these associates to pursue the racketeering enterprises' purpose." *Boyle v. United States*, 556 US 938, 946 (2009).  The Sixth Circuit has also explained that an association-in-fact enterprise "require[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach."  *Ouwinga v. Benistar 419 Plan Services Inc.*, 694 F.3d 783, 794 (6th Cir. 2012).  The Supreme Court has held that "the existence of a racketeering enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Id.* (citing *Turkette*, 452 U.S. at 583).

Each defendant argues that the government has failed to present evidence from which the jury can conclude there is a racketeering enterprise in this case.  While defendants filed separate motions for judgment of acquittal, many of their arguments are the same and in those cases the court will address them together.  Defendants attack the government's case for failing to prove that the alleged enterprise is a continuing unit that functions with a common purpose.  Specifically, defendants argue that the government has failed to offer sufficient evidence for the jury to find that the purpose of the enterprise is to protect and preserve power, territory and profits through the use of violence or

intimidation.  Rather, it is argued, the government's case only demonstrates that individuals might have sold drugs for their own hustle, or might have committed violence to settle their own beefs.  Missing from the government's evidence is anything that supports their theory of an association-in-fact enterprise with the structural elements required by the law.

### (a) Purposes

The indictment alleges that the racketeering enterprise had four purposes: (1) maximizing profits for members from illegal activities; (2) preserving and protecting the power, territory and profits of the enterprise through the use of intimidation and violence; (3) promoting and enhancing the enterprise and its members' and associates' activities; and (4) keeping victims in fear of the enterprise and its members and associates through violence and threats of violence.

The government presented evidence of SMB members and associates working together to sell drugs.  Cooperating witness Anthony Lovejoy explained how co-defendants Quincy Graham and Michael Rogers taught him how to start in the drug business.  He described the business of selling crack and marijuana in Detroit, first on the street corners and later out of stash houses.  He explained how he set up a stash house with

others in SMB so they could pool their resources.  They took turns manning the house.  They shared guns for protection.  There was other evidence of SMB members and associates working together selling drugs on the streets in Detroit, including the testimony of Johnnie Jones.  Law enforcement officers testified about arresting SMB members and associates together in possession of drugs and money.

Eventually the drug dealers moved their business from Detroit to West Virginia because it was more lucrative.  Lovejoy explained that if a member or associate of SMB wanted to start selling pills, they would stay with other SMB who had houses in West Virginia.  They would use other members, people they trusted, to bring pills to West Virginia on the bus or by rental car and then take money back to Detroit.  They used each other to help sell pills.  Derrick Kennedy testified that co-defendant Jerome Gooch sold pills for other people.  Lovejoy testified that in the drug business you rely on people you trust, your associates.

The evidence shows that SMB members and associates were found together when they were arrested, both in Detroit and in West Virginia.  There is sufficient evidence for the jury to find that these individuals were working together, sharing information, pooling resources, so they could make money.

Lovejoy, Kennedy and Matleah Scott described how much money was made by selling pills.  The evidence was that Devon McClure would bring home ten thousand dollars each time he went to West Virginia. Derrick Kennedy testified that at one time he had $180,000.00 to $230,000.00 in cash from selling pills.  The evidence included pictures of SMB members and associates wearing designer clothing and jewelry, driving expensive cars, and spending big money on parties.  The cooperating witnesses testified that none of the SMB associates had legitimate jobs.  Social media posts showed them bragging about what they had purchased with all the money.  There was also evidence that they used their money to help each other.  Kennedy testified he gave money to other SMB members and associates so they could start selling drugs, or for bail, or for their prison account.  One time he gave $1,000 to other SMB associates because he promised he would.

In addition to having guns accessible to protect themselves and their drugs and money, there was evidence that SMB was engaged in a gang war with rival gangs.  Corey Bailey described the beef between the two gangs starting in the early 2000s when AJ (Aaron Hayes) killed Drew, who was a member of the rival Hustle Boys.  There is evidence that the gangs were still rivals in 2013 when Derrick Kennedy threw a party at a club that

was also booked by one of the Six Mile gangs.  Shots were fired at the club and the casings found were shown to have come from firearms found in a limousine used by SMB associates.

When SMB member Billy Arnold saw rival gang members at the Lawton parole office on July 14, 2014, he called Corey Bailey.  Cell tower evidence and phone records show that Bailey came.  When Devon McClure was killed, Billy Arnold went hunting for rivals to get revenge and the evidence shows he was always with another SMB member or associate.  Derrick Kennedy testified that when there was a fight involving SMB and he got called, he would go to help.

There was evidence of shared firearms among SMB members and associates.  The AR-15 that was recovered on September 26, 2015, after a car chase with Billy Arnold and Steven Arthur in the vehicle, was connected to various shootings.  Ballistics expert Rebecca Smith testified that based on the casings found at the crime scenes, the same gun was used in the May 1st shooting of Raphael Carter, the May 8th shooting of Dvante Roberts, Marquis Wicker, Jessie Ritchie and Darrio Roberts, and the May 10th shooting involving Darnell Canady, Jason Gaskin and Derrick Peterson.  There was also evidence that the .40 caliber casings found at

the scene of the May 10th shooting and the June 7th shooting were shot by the same gun, although the gun was not recovered.

There was much more evidence presented at trial, but the above recitation demonstrates there is substantial evidence from which the jury could conclude that the racketeering enterprise had common purposes as set forth in the indictment.

### (b) Relationships

Evidence of the relationships among the members and associates of the enterprise alleged, SMB, has been discussed above.  The government put forth evidence at trial showing that individuals worked together to sell drugs, both in Detroit and in Charleston, West Virginia.  Some were arrested together in stash houses, in cars or at the bus station, often with drugs and money.  They shared firearms and stored them at each other's homes.  They appear in many pictures together, shown using hand signals and making gang signs.  They appear in rap videos together. There are text messages between them and their phone numbers appear on each other's contact lists.  They have tattoos with five pointed stars, "SMB", "55", and some even have the names of fellow SMB members or associates tattooed on their bodies.

Again, there is substantial evidence from which the jury could conclude that there were relationships among those associated with the enterprise.

### (c) Longevity

The indictment alleges that the enterprise existed from at least 2003 to January 3, 2018. The jury does not need to find that it existed that entire time, just that there was a period that was sufficient to achieve the purposes of the enterprise. There is substantial evidence from which the jury could find that the enterprise existed long enough to permit the associates to pursue the enterprise's purpose.

### 2. Defendant Associated With the Enterprise

To satisfy this element, the government has to establish that the defendant was associated with the enterprise in a way that is related to its affairs or common purpose.

Arlandis Shy argues that there is insufficient evidence that he associated with the enterprise in a way that is related to its purpose. The government introduced a text message sent by Shy to Billy Arnold on May 7, 2015 when Arnold was hunting for rivals after the murder of SMB member Devon McClure. On that date, Shy texted "do you want me to see if Gutta out and about?" The jury could reasonably see this as evidence

that Shy wanted to help find rival gang members to kill in revenge for McClure's murder.  Another text conversation introduced by the government is between Shy and his girlfriend Jenn discussing the fact that Shy's "team" is under federal investigation.  When Jenn asks, "You too?", Shy responds, "All the big homies."  This evidence, when considered with all the other evidence involving Shy, amounts to substantial evidence from which the jury could conclude that Shy was associated with the enterprise.

Eugene Fisher argues that there is insufficient evidence that he associated with the enterprise in a way that is related to its purpose. However, Derrick Kennedy testified that Fisher was a member of the Ruthless Clan when he was younger.  That group morphed into SMB. Evidence was also presented that after the shootings on May 1, May 8 and May 10, the shooters ended up at Fisher's house.  Kennedy testified that SMB members and associates would store their guns at Fisher's house because he lived outside the Red Zone. They believed the guns would be safer at Fisher's house.  On the night of September 25, 2015, the night of the Block Party at the Crazy Horse, Arnold texted Fisher, "I'm coming to grab something.  Be close."  Fisher replies, "I'm at the Crazy Horse." Arnold says, "I need to get in your crib and grab my hookups."

Kennedy testified that after Michael Rogers was shot on March 22, 2015, SMB members and associates got together and went hunting for rivals.  According to Kennedy, Fisher was one of those who went hunting, along with Kennedy, Shy, Arnold, McClure and Robinson.  Kennedy also testified about Fisher's involvement in a fight with the victim's family at Frank Murphy during a break at Devon McClure's murder trial.  Fisher later bragged about his involvement in the fight on social media, calling the victim a snitch.  Other social media posts show Fisher with SMB associates throwing up gang signs, or posting about the Red Zone and stating his loyalty to SMB as well as to individual members and associates.  There is substantial evidence from which the jury could conclude that Fisher was associated with the enterprise.

Keithon Porter also argues that the government did not present sufficient evidence to show that he associated with the enterprise in a way that is related to its purpose.  While Porter was not in pictures with the others, he was in a video taken by Billy Arnold at Devon Patterson's birthday party.  Porter was shown rapping in the video.  Porter has a tattoo of a red five pointed star and a mask like the one worn by Arnold.

Kennedy testified that he saw Porter at Brown's house after the May 8 shooting.  While Porter disputes that the phone the government connects

to him is his, that phone is in the vicinity of the May 1 and May 8 shootings at critical times, along with Billy Arnold's phone. Text messages between Porter and Arnold further support Porter's connection to the shootings. In one text conversation, Porter and Arnold discuss Porter's automatic rifle. There is substantial evidence from which the jury could conclude that Porter was associated with the enterprise.

Bailey and Brown did not specifically challenge the evidence on this element of a RICO conspiracy. The court finds that the body of evidence presented by the government is substantial such that the jury could find that Bailey and Brown are each associated with the enterprise in a way that is related to its purpose.

### 3. Relationship Between Racketeering Acts and Enterprise and Agreement to Commit at Least Two Acts of Racketeering in Furtherance of the Enterprise

Keithon Porter argues that there is no evidence he participated in the shooting of Raphael Carter on May 1, 2015 or the shooting on May 8, 2015 at Duchess and Craft. While there were no eyewitnesses to the shootings, there was other substantial evidence from which the jury could find that Porter agreed that he or another conspirator would commit these racketeering acts, and that there was a relationship between the racketeering acts and the enterprise.

First, as to the phone number associated with Porter (#0837), there was ample evidence presented to allow the jury to find that the phone belonged to Porter.  Specifically, the phone number was used for texting during an undercover drug transaction in September 2015, and Porter was the person who showed up with the drugs and was in possession of the phone.  In addition, the phone number was in both Bailey's and Fisher's contacts identified by the initials PK or KP.

With regard to the May 1 shooting of Carter, call detail records demonstrate that Arnold and Porter were communicating just before and just after the shooting.  Arnold was also communicating with Eugene Fisher shortly before and shortly after the shooting.  Cell tower records put Porter and Arnold close to the crime scene at the time the crime occurred, and then in the vicinity of Eugene Fisher's house within an hour after the shooting.  This amounts to substantial evidence for the jury to find a relationship between these alleged acts of racketeering and the illegal purpose of the racketeering enterprise.

Shy and Porter are alleged to have participated in the May 8 murder of Dvante Roberts and the attempted murders of Marquis Wicker, Jessie Ritchie and Darrio Roberts.  Kennedy testified that after the shooting he saw Shy holding a handgun, saying "this shit easy."  Kennedy testified that

Billy Arnold was holding an AK-47 and was mad because he said Shy was supposed to be watching his back, but instead Shy started shooting. With regard to Porter, Kennedy testified that he was holding an AR-15 and claimed he did the shooting before Arnold and Shy even arrived at the scene. Cell tower records show Shy's and Arnold's phones in the vicinity of Robert Brown's house before the shooting, then move to the area of Keithon Porter's house, and then Porter and Arnold's phones moved toward the crime scene. After the crime, all three phones were back at Brown's house. Later that night, the cell tower records put Shy, Arnold and Porter back at Fisher's house.

Shy's phone does not register any activity during the time period of the shooting, but that would not be surprising if he was in the car with Arnold, who was communicating back and forth with Porter at the time. Finally, three different types of casings are found at the crime scene, matching the same types of firearms Kennedy testified he saw Porter, Shy and Arnold possessing after the shooting.

Arlandis Shy argues that the government failed to establish sufficient evidence to show he knowingly participated in the conduct of the enterprise with regard to selling drugs. As to Shy's drug dealing in West Virginia, the government put forth evidence that Shy was arrested on January 16, 2009

in an apartment with other SMB members.  There was money, marijuana and packaging materials present in the apartment.  Then, on April 2, 2009, Shy was stopped after he got in a car at the Greyhound bus station in Charleston and 300 Oxy pills were found inside a potato chip bag in the rear seat.  He told law enforcement he was meeting Anthony Lovejoy.

The government need only show that a defendant *agreed* to participate in the conduct of the enterprise and *agreed* that he or a coconspirator would commit two acts of rackeering.  Viewed in the light most favorable to the prosecution, the jury could find these essential elements as to Porter and Shy beyond a reasonable doubt.  These elements of RICO conspiracy were not specifically challenged by the other defendants and the court finds that the body of evidence presented by the government is sufficient for the jury to find the elements have been satisfied as to all defendants.

### 4.  Racketeering Enterprise Had Substantial Effect on Commerce

As discussed above, the government introduced substantial evidence from which the jury could find that the activities of the enterprise involved interstate drug dealing, which affected interstate commerce.

**B. VICAR Counts**

Section 1959(a) requires that alleged racketeering acts must be related to the illegal purpose of the racketeering enterprise.  The defendant must be enabled to commit the charged racketeering acts by virtue of his relationship to the enterprise.  *United States v. Lawson*, 535 F.3d 434 (6th Cir. 2008).  Finally, as it relates to the shootings, the government must prove that the defendant's general purpose in shooting the victim "was to maintain or increase his position in the racketeering enterprise."  *United States v. Thai*, 29 F.3d 785, 817 (2nd Cir. 1994).  The purpose element of VICAR (Violent Crime in Aid of Racketeering) does not require the defendant to be solely motivated by a desire to increase his status within the organization, but a defendant's purpose must be more than merely incidental.

### 1.    Corey Bailey

It is Bailey's theory that the shooting of Djuan Page and Michael Davis on July 14, 2014 was due to Billy Arnold's personal vendetta because he held the Davis Twins responsible for his seven or eight year prison sentence.  Bailey supports this theory with evidence demonstrating that when Arnold was released from prison he sought revenge against the Hustle Boys even though the beef between the groups had calmed down

while Arnold was in prison.  This includes the incident at Somerset Mall in May 2014 when Arnold saw the Davis Twins, and at the Lawton parole office on July 14, 2014 where both Arnold and the Davis Twins had meetings with their parole officers.  Bailey argues that the July 14 shooting had only to do with personal revenge on the part of Arnold.

However, the government presented evidence of a beef between SMB and Hustle Boys that was greater than Arnold's personal quest for revenge.  There was evidence, including Bailey's own statements to police, that the beef between SMB and Hustle Boys began in the early 2000's when AJ killed Drew.  Then, according to Matleah Scott, in the days before Djuan Page (also known as Neff) was murdered on July 14, 2014, Devon McClure and Bailey went to a Hustle Boys party "to start something."  McClure came out of the club bleeding, saying that he was hit in the head with a bottle by Neff.  McClure and Bailey gathered with other SMB members to tell them about the incident.

The evidence shows that on July 14, 2014, when Arnold saw the Davis Twins at the parole office, he called Bailey.  In his interview with Lori Dillon, Bailey describes Billy Arnold as his partner.  Bailey has a tattoo of Arnold's nickname "B-Man" on his body.  Bailey responded because when

there is violence, SMB members and associates have each other's back. Derrick Kennedy explained that this is the way it was.

There is substantial evidence from which the jury could conclude that at least one animating purpose of Bailey's participation in the Djuan Page homicide was to maintain his reputation and his association with SMB. Furthermore, there is substantial evidence from which the jury could conclude that the June 14 shooting was enabled by Bailey's relationship with the racketeering enterprise.

### 2.   Keithon Porter

There was evidence from Kennedy's testimony that Porter had a beef with another gang, "NBA", so he chose to associate with SMB.  The government's theory is that Porter wanted to support his own association and reputation with SMB so they would provide him with protection.  If he helped SMB, then SMB would help him.  A second possible motive is that Porter wanted to help Billy Arnold seek revenge for the killing of Devon McClure to support Arnold's reputation in SMB.  To further one or both of these ends, Porter participated in the May 1 and May 8 shootings.  As outlined above, the evidence puts Porter and Arnold together before, during and after the time of the May 1 shooting.  The evidence also puts Porter, Arnold and Shy together during the time period surrounding the May 8

shooting.  The same AR-15 was shown to have been used at both incidents.

There is substantial evidence from which the jury could conclude that at least one animating purpose of Porter's participation in the May 1 shooting of Carter and the May 8 murder of Dvante Roberts and attempted murders of Marquis Wicker, Darrio Roberts and Jessie Ritchie was to maintain his reputation and his association with SMB.  Furthermore, there is substantial evidence from which the jury could conclude that the May 1 and May 8 shootings were enabled by Porter's relationship with the racketeering enterprise.

### 3.    Robert Brown

Robert Brown argues that the government has failed to meet its burden to establish that he committed the McDougal homicide because he knew it was expected of him by his membership in the alleged enterprise in order to maintain or increase his position therein.  The court disagrees. The government introduced evidence through Anthony Lovejoy that Brown had a violent reputation.  Brown portrayed himself as a leader of SMB.  He called himself "R.O. the Great."  His neighbor Johnnie Jones saw him as a leader of SMB, someone people listened to.  When Jones had a problem

with SMB dealing drugs in front of his house, he asked Brown to make it stop.

Martielle Barber testified that he witnessed a street fight where the smaller guy was getting the best of the bigger guy.  The evidence supports a finding that Brown was the bigger guy described in that fight.  Knowing the evidence of Brown's reputation, it is reasonable to conclude that he could not let McDougal beat him up in public without consequences.  The evidence, including the testimony of Barber, Lovejoy and Kennedy, shows that Brown went to an SMB trap house, retrieved an AK-47, had SMB associate Jonathan Murphy drive him back to the scene of the fight, and killed McDougal.

With regard to the May 10 shooting, this was in the midst of the gang war.  The evidence shows that Brown helped Arnold hunt for rivals.  Cell tower records put Brown and Arnold's phones in the same area near the crime scene within minutes of the shooting.  After the shooting, Brown and Arnold traveled to the vicinity of Fisher's house.  Later that night, text messages between Brown and Arnold show they met up again at Fisher's house.  Again, the same AR-15 used before is tied to the May 10 shooting.

There is substantial evidence from which the jury could conclude that at least one animating purpose of Brown committing the murder of Cleo McDougal was to maintain his reputation within SMB.  As for the May 10 shooting, there is substantial evidence to conclude that Brown was helping Arnold seek revenge for McClure's murder to support his own or Arnold's reputation in SMB.  Furthermore, there is substantial evidence from which the jury could conclude that both shootings were enabled by Brown's relationship with the racketeering enterprise.[1]

### 4.    Arlandis Shy

Arlandis Shy argues that the government has failed to meet its burden to establish that he participated in the May 8 shooting for the purpose of maintaining or increasing his position in the racketeering enterprise.  The government introduced evidence that Shy saw himself as a shooter within SMB, referring to himself on social media as an "OG", a "boss", a "big homie."  Reputation within the enterprise is important and there is substantial evidence from which the jury may find that maintaining his reputation motivated Shy to participate in the May 8 shooting.  Furthermore, there is substantial evidence from which the jury could

---

[1] Brown's remaining arguments attempt to challenge the constitutionality of the prosecution and are not founded on the insufficiency of the evidence under Rule 29(a).

conclude that the May 8 shooting was enabled by Shy's relationship with the racketeering enterprise.

### 5.    Eugene Fisher

The government introduced evidence to show that Fisher's reputation is important to him.  His social media posts paint a picture of a person who wants others to see him as an OG, Red Zone King, Big Blood.  There was substantial evidence at trial of Fisher storing guns at his house.  Cell tower records show that SMB members and associates were in the vicinity of Fisher's house before and/or after many of the shootings.  Kennedy testified that people stored firearms at Fisher's house.  There are pictures of Fisher holding firearms.  Text messages between Fisher and others support that people went to Fisher's house to pick up firearms.

Fisher is charged with the May 10 shooting and the use of the firearm, along with Robert Brown and Billy Arnold.  The charge includes aiding and abetting.  The AR-15 that Fisher identifies as his gun in a Facebook message, and that was recovered in the case, was shown by ballistics evidence to have been used in the May 10 shooting.  Robert Brown and Billy Arnold were in the vicinity of Fisher's house just after the shooting on May 10.

There is substantial evidence from which the jury can conclude that Fisher aided and abetted the May 10 shooting by providing the gun, knowing that its purpose was to kill rival gang members.  The government produced substantial evidence to support a finding that Fisher was motivated to provide the gun to maintain or enhance his reputation. Furthermore, there is substantial evidence from which the jury could conclude that the May 10 shooting was enabled by Fisher's relationship with the racketeering enterprise.

## III. Conclusion

For the reasons stated above, defendants' Motions for Judgment of Acquittal are DENIED.

IT IS SO ORDERED.

Dated:  August 27, 2018

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 27, 2018, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk